BURLEIGH F. BARNETT AND NANON L. BARNETT, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9270–76.    Filed January 26, 1978.

*Allen E. Pye*, for the petitioners.
*William P. Hardeman*, for the respondent.

### OPINION

TIETJENS, *Judge:* Respondent has determined a deficiency in petitioners' Federal self-employment tax for 1972 in the amount of $589.97. The issue is whether money received by petitioner Burleigh F. Barnett under a contract between him and Citizens First National Bank of Tyler is self-employment income subject to tax under section 1401.[1]

This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners timely filed a joint Federal income tax return for 1972 with the Internal Revenue Service Center in Austin, Tex. When they filed their petition with this Court, petitioners resided in Tyler, Tex.

Prior to December 31, 1969, petitioner Burleigh F. Barnett (hereafter petitioner) was employed as the chief executive and administrative officer of Citizens First National Bank of Tyler in Tyler, Tex. On December 31, 1969, petitioner retired. Upon retirement, petitioner entered into an agreement with the bank in which it was provided that the bank would pay petitioner $1,000 per month for his services as a consultant. Among other things, petitioner promised not to compete with the bank.

---

[1]Unless otherwise stated, all statutory references refer to the Internal Revenue Code of 1954.

The text of the agreement follows:

## CONSULTING AGREEMENT

THIS AGREEMENT made this 21st day of October, 1969, between CITIZENS FIRST NATIONAL BANK OF TYLER, Tyler, Texas, (hereinafter referred to as the "Bank") and B. F. BARNETT (hereinafter referred to as "Barnett");

### WITNESSETH

WHEREAS, Barnett has been active in the commercial banking business for over fifty-two (52) years and has great ability in such business and intimate knowledge of the Bank, its operating methods, personnel and problems; and

WHEREAS, the Bank desires to secure Barnett's commitment to furnish advisory services to the Bank following termination of his employment by the Bank and to compensate him therefor;

Now, THEREFORE, the Bank and Barnett mutually agree as follows:

1. Bank agrees to retain Barnett as a consultant and advisor with respect to the business and affairs of the Bank for a period commencing with his retirement (the 31st day of December, 1969) and to end the 31st day of December, 1974, or upon Barnett's prior death or disability or inability by reason of health to furnish reasonable services of an advisory or consulting nature.

2. Barnett agrees to furnish reasonable services of an advisory or consulting nature with respect to the business and affairs of the Bank as the Bank may reasonably call upon him to furnish and as his health may permit. However, it is understood that such services shall not require Barnett to be active in the day-to-day operations of the Bank and that Barnett shall not be an employee of the Bank but shall act in the capacity of an independent contractor. In this regard, Barnett is free at all times to arrange the time and manner of performance of the consulting services. The Bank may if it wishes, provide Barnett with an office on the Bank premises but Barnett shall not be obligated to use such office. The Bank may also make a secretary available to Mr. Barnett on a part-time basis.

3. Barnett's activities as a consultant and advisor shall include, but not be limited to (1) advice to the management of the bank; (2) advice to the officers of the Bank in the solution of banking problems and contract negotiations; and (3) to present recommendations and make studies with reference to the operation of the bank.

4. Barnett agrees that during the period covered by this contract, he will not act in a similar capacity for any business enterprise which competes in a substantial degree with the Bank and will not engage in any activities involving substantial competition with the Bank.

5. In consideration of Barnett's promise to perform services under this contract, the Bank agrees to pay to Barnett the sum of ONE THOUSAND AND NO/100 ($1,000.00) DOLLARS per month plus reimbursements for expenses incurred in connection with the performance of services under this contract.

6. In addition to the amounts specified in Paragraph 5 above, Barnett shall continue to receive as a member of the Board of Directors of the Bank, a fee

presently fixed at $50.00 for each Directors Meeting which he attends. However, at no time shall Barnett accept the position of Chairman of the Board of Directors. If the Board of Directors asks him to serve on the Executive Committee of the Board of Directors, he will agree to serve as a member of such committee but will not accept the position of Chairman of such committee. If Barnett is asked to serve on the Executive Committee of the Board of Directors, he shall receive a fee presently fixed at $20.00 for each Executive Committee meeting which he attends.

7. In the event that Barnett shall for any reason become unable, by reasons of disability or poor health or otherwise, to perform the duties contemplated by this agreement, and if such incapacity shall continue for a period of six months or more, the Board of Directors acting in good faith and without prejudice may terminate this agreement.

8. Either party may, without reason, terminate this contract at the end of any calendar year during the term hereof. Such option may be exercised by either party giving written notice to the other party prior to December 31st of any year during the term hereof of such party's intent to exercise this option.

9. This agreement is contingent upon the receipt by Mr. Barnett of a ruling from the Internal Revenue Service that he has been separated from the service of the Bank within the meaning of Section 402(a)(2) on the 31st day of December, 1969, and that the total amount standing to the credit of Mr. Barnett under the Bank's retirement plan, if distributed within one of his taxable years, will be considered a gain from the sale or exchange of a capital asset held for more than six months as provided in Section 402(a)(2). In the absence of such a ruling, neither party to this contract shall be bound under the terms hereof. [Signatures omitted.]

Pursuant to paragraph 9 of the agreement, petitioner sought a ruling from respondent concerning the taxability of certain distributions to him from the Bank's retirement plan. The ruling was favorable, and the contract is therefore no longer contingent.

In order to obtain a favorable ruling, petitioner had to explain the circumstances under which the distribution from the retirement plan arose. Those circumstances were recited in the ruling issued by respondent, which provides in pertinent part as follows:

The Bank has entered into an agreement with you to retain you as a consultant and advisor with respect to its business and affairs for a period commencing with your retirement and ending December 31, 1974, or upon your prior death or inability to perform services for health reasons. It is understood that such services shall not require you to be active in the day-to-day operations of the Bank and that you will act in the capacity of an independent contractor. You will be free at all times to arrange the time and manner of the performance of the consulting services. The Bank may, if it wishes, provide you with an office on its premises but you will not be obliged to use such office; it may also provide you with secretarial services. Your activities as a consultant

shall include giving advice to the Bank's management and to its officers in the solution of banking problems and contract negotiations, presenting recommendations, and making studies with reference to the Bank's operations.

After January 1, 1970, you no longer had authority to initiate policies or procedures and no officer or employee reported to you. You expect to be requested to study policies and procedures in connection with the Bank's operational policies but will have no authority to initiate such studies, order changes to be made, or direct any employee or officer of the Bank in connection with such studies. If requested, you will make recommendations relative to changes in the Bank's bond portfolio and you expect to be requested to study policies and procedures in connection with extention of major credit by the Bank. In consideration of your services, the Bank agreed to pay you $1000.00 per month plus reimbursements for expenses incurred in connection with such services.

You will continue to be a member of the Bank's board of directors and to receive a fee of $50.00 for each directors' meeting you attend. It is specifically provided in the agreement that you shall at no time accept the position of chairman of the board. By an amendment to the agreement, the Bank agrees not to ask you to serve as a member of the executive committee of the board. Either party may terminate the agreement by giving written notice to the other prior to December 31st of any year during the term of the agreement of such party's intent to terminate it. The amendment to the agreement also provides that it is anticipated that the time required for your services as a consultant will not require more than two mornings per week on the average during any one year. *You expect to be available to perform similar consultant services for banks outside of Tyler, Texas.* [Emphasis supplied.]

It is stipulated that for purposes of this case, the above statement is true.

During 1972, petitioner performed consultative and advisory services for the bank, for which he received $12,000 compensation. He performed no such services for any other bank or financial institution. Petitioners contend that none of the money received in 1972 pursuant to the consulting agreement is income from a "trade or business" carried on by petitioner. Respondent argues to the contrary that petitioner was carrying on a "trade or business," the income from which is subject to self-employment tax under section 1401.

Section 1401(a) imposes a tax for each taxable year on the "self-employment income" of every individual. "Self-employment income" is defined as "net earnings from self-employment" derived by an individual (other than a nonresident alien) during any taxable year, with certain exceptions not pertinent here. Sec. 1402(b). "Net earnings from self-employment" is in turn defined in section 1402(a) to mean gross income derived by an individual from any "trade or business" carried on by such

individual. Finally, section 1402(c) provides that the term "trade or business" shall, for purposes of section 1402, have the same meaning as it does when used in section 162. Section 162 provides no further definition for "trade or business," other than that which has evolved under prevailing case law under that section.

Neither the Internal Revenue Code nor the court decisions contain an explicit definition of the term "trade or business" or of what constitutes "carrying on any trade or business." *Barrett v. Commissioner*, 58 T.C. 284, 288 (1972). Although various factors have been considered in deciding whether a taxpayer's activities are a trade or business, none alone is dispositive. *Gentile v. Commissioner*, 65 T.C. 1, 4 (1975); *Barrett v. Commissioner*, supra at 288. Thus it is essentially a factual determination. See *Higgins v. Commissioner*, 312 U.S. 212, 217 (1941).

In this case, petitioner was an executive of the bank prior to his retirement. When he retired in 1969, petitioner continued to provide consulting services to the bank as an independent contractor. In return for a consulting fee of $1,000 per month, he also agreed not to perform similar services for any business that competes in a substantial degree with the bank. Services were in fact performed by petitioner for the bank only. However, it has also been stipulated that petitioner expected to be available to perform similar consultant services outside of Tyler, Tex. Thus petitioner was not actually prohibited by contract from rendering consulting services to other banks or financial institutions; he was only restricted in the Tyler, Tex., area.

The burden to prove that petitioner did not in fact carry on any trade or business is of course on petitioner. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. To meet his burden, petitioner must prove that he did not hold himself out to others as engaged in the selling of goods or services, *Deputy v. du Pont*, 308 U.S. 488, 499 (1940) (Frankfurter, J., concurring); accord *Snow v. Commissioner*, 416 U.S. 500, 502–503 (1974); or that he was contractually prohibited from so acting. *Barrett v. Commissioner*, supra. Petitioner has failed to meet his burden. There is nothing in the record to indicate that petitioner did not hold himself out to others as engaged in the selling of his services as a consultant. The fact that he performed services only for the bank in 1972 does not preclude our finding him to be engaged in a trade or

business. See *Clarke v. Commissioner*, 27 T.C. 861 (1957); *O'Connell v. Commissioner*, T.C. Memo. 1974–128. The focus is on whether petitioner held himself out to others, not on whether he actually performed the services. Cf. *Barrett v. Commissioner*, *supra* at 289.

Petitioners' reliance on *Barrett v. Commissioner, supra,* is misplaced. In *Barrett,* the taxpayer was a retired corporate executive. He had entered into a consulting agreement prior to retirement in which he promised to render consulting services to his employer upon retirement in exchange for a certain salary. The taxpayer also agreed not to render consulting services to any other competing companies. We held that the taxpayer was not liable for a self-employment tax on the consulting fees because he was not engaged in a trade or business. This Court found the agreement between the taxpayer and his employer to prohibit him from rendering services of any kind to another employer which might be deemed competitive or against his employer's best interest. Thus we found that he was unable to hold himself out to others as engaged in the selling of his services as a consultant.

Our decision in *Barrett* is clearly distinguishable on its facts. The taxpayer in *Barrett* was precluded by contract from holding himself out to others as a consultant. In this case, petitioner is not prohibited by contract from holding himself out to others as a consultant. On the contrary, petitioner concedes his availability as a bank consultant outside of Tyler. If petitioner contends that, notwithstanding his availability to perform consultant services outside of Tyler, he never actually held himself out to others as engaged in the selling of his services, then he should have presented evidence to that effect. Absent such evidence, we must conclude that petitioner was engaged in a trade or business in 1972 for which he received self-employment income, taxable under section 1401(a).

*Decision will be entered for the respondent.*